[No. A104920. First Dist., Div. One. Jan. 22, 2004.]

ALLAN ZAREMBERG et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
KEVIN SHELLEY, as Secretary of State, etc., et al., Real Parties in Interest.

**COUNSEL**

Livingston & Mattesich, Steven G. Churchwell; Gibson, Dunn & Crutcher and Daniel M. Kolkey for Petitioners.

Bill Lockyer, Attorney General, Louis R. Mauro, Assistant Attorney General, Kenneth R. Williams and Hiren M. Patel, Deputy Attorneys General, for Real Party in Interest Bill Lockyer.

Randy Riddle and Anthony Miller for Real Party in Interest Kevin Shelley.

Remcho, Johansen & Purcell, Robin B. Johansen, Kathleen J. Purcell and Thomas A. Willis for Real Parties in Interest Senator John Burton and Senator Jackie Speier.

**OPINION**

**SWAGER, J.**—Allan Zaremberg and John Dunlap III are proponents of a voter referendum petition to overturn the Health Insurance Act of 2003 (Act) (Stats. 2003, ch. 673). By petition for writ of mandate, they challenge orders entered December 12, 2003, by the Sacramento County Superior Court which

prohibit qualification of the referendum for the ballot.[1] The superior court found that the Attorney General's title and summary of the referendum petition is inaccurate and misleading (Elec. Code §§ 9004 & 9051),[2] and also that the petition failed to comply with section 9011, which requires a short title at the top of each page after the first page. We disagree and accordingly will issue our peremptory writ.[3]

The petition was filed in this court late in the day Friday, December 19, 2003.[4] This court did not receive the complete petition, other filings and the record until the end of the day, December 22, 2003. Referendum proponents included a request for a stay of the superior court's orders and of the printing of ballots for the March 2, 2004 election. But according to documents submitted by referendum proponents,[5] the ballot labels for the 15 million ballots to be printed for that election were transmitted to the state-certified printing firms by the close of business, December 15, 2003, one week before we received the complete petition and record. Failure to comply with the December 15, 2003 deadline would create a significant risk that printing of ballots would not be completed by February 2, 2004, the first day of absentee balloting for the election. Accordingly, although we issued our alternative writ in order to resolve the merits of the case by opinion, we denied the request for stay. (§ 13314, subd. (a)(2).)

---

[1] For convenience, we will refer to Messrs. Zaremberg and Dunlap as referendum proponents.

[2] Further statutory references unless otherwise noted are to the Elections Code.

[3] The Attorney General joins referendum proponents in defending his title and summary. He takes no position on whether the referendum petition meets the requirements of section 9011.

[4] The Sacramento County Superior Court lies within the Third Appellate District, and the petition was initially filed there on December 15, 2003. On December 19, 2003, that court filed an order recusing its members from participating in the case. The order stated: "Although each of us concludes there is no actual basis for disqualification, in that we could decide this matter impartially, the Presiding Justice and Associate Justices of the Court of Appeal, Third Appellate District, recuse ourselves from this matter because Daniel M. Kolkey, counsel for petitioners, served with us as a justice of this court until his recent resignation effective November 15, 2003, to return to the private practice of law. Although this is a very close question, we exercise caution by recognizing the possibility that 'a reasonable person aware of the facts [i.e., Mr. Kolkey's *recent* service in this court] would doubt [our] ability to be impartial. . . .' (Cal. Code Jud. Ethics, canon 3E(3)(iii).)" On that same date, the California Supreme Court transferred the matter here.

[5] In a supplemental return to our alternative writ, the Secretary of State submitted a declaration from the Chief of the Elections Division concerning preparations for the March 2, 2004 statewide primary election that have occurred subsequent to the transfer of the petition to this court. We decline to consider this declaration as it is unnecessary to our resolution of the issues before us.

## BACKGROUND

Senate Bill No. 2, the Health Insurance Act of 2003 (Stats. 2003, ch. 673), was enacted ·October 6, 2003. (Sen. Bill No. 2 (2003–2004 Reg. Sess.)). Immediately, referendum proponents commenced their effort to overturn the Act and collected signatures sufficient to qualify the measure for the March 2, 2004 ballot. On December 5, 2003, State Senators John Burton and Jackie Speier initiated a proceeding in the County of Sacramento Superior Court (§ 13314, subd. (b)(3)) challenging the referendum petition on two grounds. First, they contended that "the Title and Summary, which is set forth on the first page of the petitions and on the signature pages, contains a significant, misleading and prejudicial error. It states that Sen. Bill 2 'creates mandatory employee health care benefits ·program for employers with 20 or more employees.' In fact, Sen. Bill 2 creates a mandatory program only for employers with 50 or more employees." Second, they argued that "the petitions fail to set forth on each page a short title 'showing the nature of the petition and the subject to which it relates' as required by Election[s] Code section 9011."

The referendum proponents denied these allegations and, in addition, argued that the doctrine of laches barred Senators Burton and Speier from making their challenge. On December 9, 2003, the Secretary of State informed the superior court that his office would not certify the measure for the ballot unless ordered to do so by the court because the referendum petitions failed to comply with section 9011. (§ 9012.) Thereafter, referendum proponents filed their own action to compel the Secretary of State to certify the referendum for the ballot. That action was consolidated with that of Senators Burton and Speier. After briefing and oral argument, the Sacramento County Superior Court granted the petition of Senators Burton and Speier and denied that of referendum proponents. This petition followed.

## DISCUSSION

Fundamental principles guide our review in this case. "The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." (Cal. Const., art. II, § 9, subd. (a).) "The initiative and referendum are not rights 'granted the people, but . . . power[s] reserved by them. Declaring it "the duty of the courts to jealously guard this right of the people" [citation], the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" [citation]. "[It] has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right not be improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will

preserve it." ' [Citations.]" (*Rossi v. Brown* (1995) 9 Cal.4th 688, 695 [38 Cal.Rptr.2d 363, 889 P.2d 557].) Consistent with this policy, we recently observed, "[t]he ballot box is the sword of democracy. A court will intervene in the . . . process only when there are clear, compelling reasons to do so." (*San Francisco Forty-Niners v. Nishioka* (1999) 75 Cal.App.4th 637, 643 [89 Cal.Rptr.2d 388].) At the same time, "despite the courts' duty to jealously guard the people's right of initiative and referendum . . . noncompliance with the Elections Code can result in . . . disqualification from the ballot. . . . Although courts are charged to construe the Elections Code to favor the people's awesome . . . power, 'the statutes designed to protect the elector from confusing or misleading information should be enforced so as to guarantee the integrity of the process.' " (*Id.*, at pp. 643–644, citations omitted.)

### 1) *The Attorney General's Title and Summary*

Prior to circulating a referendum petition for signatures, proponents must submit it to the Attorney General for preparation of a "title and summary of the chief purpose and points of the proposed measure" which may not exceed 100 words. (§ 9002.) The summary must be included in the petition to be circulated in 12-point type, "upon each page of the petition on which signatures are to appear" (§ 9008, subd. (a)) and "upon each section of the petition preceding the text of the measure." (§ 9008, subd. (b).) The Attorney General is required to provide an impartial statement in language that "shall neither be an argument, nor be likely to create prejudice, for or against the proposed measure." (§ 9051.) "The main purpose of [the title and summary] requirements is to avoid misleading the public with inaccurate information." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 243 [149 Cal.Rptr. 239, 583 P.2d 1281]; and see *Clark v. Jordan* (1936) 7 Cal.2d 248, 252 [60 P.2d 457]; *Boyd v. Jordan* (1934) 1 Cal.2d 468, 475 [35 P.2d 533].)

The title and summary prepared by the Attorney General read as follows: "Referendum Petition to Overturn Amendments To Health Care Coverage Requirements. If signed by the required number of electors and timely filed with the Secretary of State, this petition will prevent implementation of Chapter 673, Statutes of 2003, previously approved by the Legislature and Governor, unless and until it is approved by a majority of voters. Measure creates mandatory employee health care benefits program for employers with 20 or more employees. Employees working 100 hours per month are covered. Fee for coverage paid at least 80 % by employer and up to 20 % by employee contribution. Exempts employers providing for alternative coverage."

Senators Burton and Speier argue here, as they did below, that the summary is affirmatively misleading because it states that the bill passed by the Legislature "creates mandatory employee health care benefits program for employers with 20 or more employees" when in fact section 2 of the bill specifies that the health care benefits provisions will not apply to businesses employing 20 to 49 persons "unless a tax credit is enacted that is available to those employers with at least 20 employees but no more than 49 employees." The tax credit has not been enacted.

Referendum proponents reply that the Attorney General's statement is technically correct. They argue the measure does enact a mandatory health care benefits program for all employers with 20 or more employees even if employers with 20 to 49 employees will only become subject to the law if the specified tax credits are enacted. The program, however, is still "mandatory."

Senate Bill No. 2 is a relatively lengthy and complex bill with the goal of providing health care coverage to employees through contributions from both the employer and employee. The Attorney General was mandated to prepare a title and summary of the referendum to overturn this legislation in 100 words or less. (§ 9002.) This can be a difficult task where multiple reasonable interpretations of the referendum and the complex underlying legislation are possible. Our high court has therefore required that "all legitimate presumptions should be indulged in favor of the propriety of the [Attorney General's] actions." (*Epperson v. Jordan* (1938) 12 Cal.2d 61, 66 [82 P.2d 445].) The Attorney General is required to summarize " 'the chief purpose and points' " of a measure, and "[i]f reasonable minds can differ as to whether a particular provision is or is not a 'chief point' of the measure the determination of the [Attorney General] should be accepted." (*Id.* at p. 70.)

Here it is apparent, as referendum proponents argue, that the chief purpose of the Health Insurance Act of 2003 is the provision of health care coverage to workers and their families. In section 1 of the Act, the Legislature made a number of findings, including "that working Californians and their families should have health insurance coverage"; that "more than 80 percent of Californians without health insurance coverage are working people or their families"; that "[m]ost of these working Californians without health insurance coverage work for employers who do not offer health benefits"; and that "the social and economic burden created by the lack of health coverage for some workers and their dependents creates a burden on other employers, the State of California, affected workers, and the families of affected workers . . . ."

Consistent with these findings, as the Legislative Counsel's Digest explains, the Act requires specified health benefits to be provided directly by employers or through the newly created State Health Purchasing Program

administered by the Managed Risk Medical Insurance Board. The Act requires large employers (defined in the Act as those employing 200 or more employees) to cover those employees and their dependents beginning January 1, 2006. The Legislative Counsel's Digest goes on to explain that medium employers (defined elsewhere in the Act to be those with 20 to 199 employees) must comply beginning January 1, 2007, "subject to certain conditions." Like the Attorney General's summary, the Legislative Counsel's Digest makes no specific mention of the condition applicable to the sub-category of medium employers with 20 to 49 employees who "are not required to comply . . . unless a tax credit is enacted that is available to" them.

■ "[T]he title and summary prepared by the Attorney General are presumed accurate, and substantial compliance with the 'chief purpose and points' provision is sufficient." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra,* 22 Cal.3d 208, 243.) While the Act also contains numerous "auxiliary and subsidiary" (*Epperson v. Jordan, supra,* 12 Cal.2d 61, 71) matters not mentioned in the summary, it is not unreasonable to conclude, as referendum proponents argue, that failure to mention the tax credit contingency does not alter the chief purpose nor render the summary fatally defective. As we have previously explained "a statement of the major objectives . . . of the measure is satisfactory." (*Brennan v. Board of Supervisors* (1981) 125 Cal.App.3d 87, 92 [177 Cal.Rptr. 677].)[6]

■ We therefore agree with referendum proponents and the Attorney General that the title and summary may be reasonably read to accurately describe the "chief purpose and points" of the Act, accounting for the possible enactment of the tax credit to fully effectuate the Legislature's stated purpose to provide health insurance coverage. Like the ballot summary that was the subject of our review in *Brennan v. Board of Supervisors, supra,* 125 Cal.App.3d 87, 96, the Attorney General's summary, while "technically imprecise," nonetheless fairly represents the Act. Affording the summary the presumption that we must and recognizing that reasonable minds may differ on its adequacy, we do not find on the record before us that it is fatally defective.

2) *The Short Title.*

Section 9011 specifies that "[a]cross the top of each page after the first page of every referendum petition or section of a referendum petition, which

---

[6] In contrast, our high court has invalidated proposed initiative measures in which the short titles completely failed to inform voters that the measures in fact concerned enactment of new taxes. (See *Clark v. Jordan, supra,* 7 Cal.2d 248, and *Boyd v. Jordan, supra,* 1 Cal.2d 468.)

is prepared and circulated, there shall be printed in 18-point gothic type a short title, in 20 words or less, showing the nature of the petition and the subject to which it relates." The trial court found that the petition failed to comply with this requirement.

The referendum petition is a two-sided paper measuring 17 inches by 28 inches, folded into quarters each measuring 8-1/2 inches by 14 inches. Each quarter is numbered in sequence on the bottom right-hand corner, with the exception of the signature page which contains no page number. If one holds the petition like a traditional booklet, the first page, containing the Legislative Counsel's Digest of the Act along with portions of its text, is numbered page 1, and the last page is the signature page which is not numbered. Pages 2 through 7 continue the text of the Act. Pages 2 and 3 are upside down when one opens the document proceeding from page 1. After a reader adjusts the document so that pages 2 and 3 are right side up, the document must be opened to its full 17-inch by 28-inch size to view and read pages 4 through 7.

The short title, "Referendum Petition to Overturn Amendments to Health Care Coverage Requirements," appears in the same paragraph as the 12-point Attorney General's summary on numbered page 1 of the petition, and in addition, appears above that paragraph in 18-point gothic type. Pages 2 through 7 contain neither the 12-point title and summary, nor the 18-point short title. The unnumbered page of the petition, the signature page, does contain the 12-point version of the title and summary, all in one paragraph, but does not contain the additional 18-point gothic-type version of the short title.

" [T]echnical deficiencies in referendum and initiative petitions will not invalidate the petitions if they are in 'substantial compliance' with statutory and constitutional requirements. [Citation.] A paramount concern in determining whether a petition is valid despite an alleged defect is whether the purpose of the technical requirement is frustrated by the defective form of the petition." (*Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 652 [180 Cal.Rptr. 297, 639 P.2d 939].) Referendum proponents contend that the petition substantially complies with section 9011, particularly when analyzed in light of the principle that the policy of the judiciary is to apply a liberal construction to the power of the referendum when it is challenged. (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473].) We agree.

The failure of the proponents to print the short title on each page of the petition is not confusing or misleading since it is apparent that the pages

from which the short title is missing are continuation pages of the text of the Act. Each of those pages does contain the statement required by section 9010: "Referendum Against an Act Passed by the Legislature." And the short title of the referendum, "Referendum Petition to Overturn Amendments to Health Care Coverage Requirements," appears along with the Attorney General's summary, both on page 1 (the page commencing the text of the Act) and on the signature page. "The requirements of both the Constitution and the statute are intended to and do give information to the electors who are asked to sign the initiative petitions. If that be accomplished in any given case, little more can be asked than that a substantial compliance with the law and the Constitution be had, and that such compliance does no violence to a reasonable construction of the technical requirement of the law." (*California Teachers Assn. v. Collins* (1934) 1 Cal.2d 202, 204 [34 P.2d 134].) Viewing the document, as we must, in favor of preserving the right of referendum, we conclude that it is in substantial compliance with section 9011.[7]

## CONCLUSION AND DISPOSITION[8]

The superior court erroneously prohibited qualification of the referendum for the March 2, 2004, election ballot. By the time the remittitur issues in this case (Cal. Rules of Court, rule 26), it will be impossible to certify the measure for that election; however, the inability to place it on the March ballot does not prevent its submission at a succeeding statewide election. (§ 9006.)

Therefore, let a peremptory writ of mandate issue commanding respondent, Sacramento County Superior Court, to set aside its orders entered December 12, 2003, in Nos. 03 CS 01745 and 03 CS 01757, and to instead enter new and different orders denying the petition of Senators Burton and Speier and granting the petition of referendum proponents.

---

[7] In reaching our conclusion we reiterate an observation made by our high court 70 years ago: "At this point, let us say that, in applying to this proceeding 'the rule of substantial compliance,' we do so with the reservation that such interpretation as we have given must not be relied upon to determine every proceeding of similar nature. The procedure set up by the Constitution and the statute is simple, clearly expressed and may be exactly followed with little difficulty. 'Substantial compliance' may be carried too far, in which case its application may not be relied upon to save carelessly or negligently prepared petitions." (*California Teachers Assn. v. Collins, supra*, 1 Cal.2d 202, 205.)

[8] In view of our disposition we need not address the issue that the Senators' challenge is barred by the doctrine of laches.

This opinion is final as to this court immediately. (Cal. Rules of Court, rule 24(b)(3).) The parties shall bear their own costs.

Marchiano, P. J., and Margulies, J., concurred.